Raymond E. DILG and Billie H. Dilg, Plaintiffs,

v.

Harry CHAMETZNIK, William Prichep and R. C. Williams & Co., Inc., Defendants.

Civ. A. No. 13630.

United States District Court E. D. New York.

June 27, 1958.

Warner, Birdsall & Anfuso, New York City, for plaintiffs, by Victor L. Anfuso, James E. Birdsall and Carl Golden, New York City, of counsel.

John E. Dolan, Jr., New York City, for defendant, Harry Chametznik, by Joseph H. Reitman, Brooklyn, N. Y., of counsel.

Alexander, Ash & Schwartz, New York City, for defendants, William Prichep and R. C. Williams & Co., Inc., by Sidney A. Schwartz, New York City, of counsel.

BYERS, Chief Judge.

The plaintiff Raymond E. Dilg, and his wife, Billie H. Dilg, were injured on June

15, 1953 at about 2:45 p. m., while riding as passengers in a taxicab en route from Idlewild to a New York hotel.

The cab was driven by the defendant Chametznik which struck a private car ahead (Plymouth) driven by defendant Prichep, who was in the employ of R. C. Williams & Co., Inc.; at the time he was pursuing the course of his duties as salesman.

The place of the collision was the Van Wyck Expressway in the County of Queens, within this District, at a point about 150 to 200 feet beyond the turnoff at 87th Street, which provided access to Queens Boulevard leading to Long Island City; the latter was the destination of Prichep.

He was proceeding in the extreme left of three lanes in the northbound section of said highway, when his car was struck in the right rear by the left front of the taxi, with such force that Prichep's car was driven on to the adjoining mall which separates the northbound from the southbound traffic, and was spun around to its own left and came to rest facing in a southerly direction.

As to the fact of collision, there is no controversy; the only issue to be decided is whether the Plymouth had come to a stop without warning to any following car so abruptly that the taxi crashed into it, because the driver of the latter was unable to avoid so doing.

A finding is necessary as to that aspect of the case.

The evidence has been studied in the effort to resolve the conflicting testimony of the drivers of the two cars, and the only persons who were called to trial as eye witnesses of what took place, namely, James Halpin called by the plaintiffs, and Mrs. Agnes Dark called by the defendant Prichep.

The allegations of the amended complaint show that the plaintiffs undertook to prove that their injury was caused "solely and wholly by the negligence of the defendants and each of them * *."

As to the negligence of Chametznik, there is little occasion for discussion.

His testimony is that having taken his passengers at the Airport, namely, the plaintiffs and their daughter and a pet dog, he proceeded toward his destination, using the Van Wyck Expressway, and prior to the accident was driving in the center of the three lanes.

It should be said that the day was fair, and weather conditions played no part in the collision. A short time before the collision, Chametznik observed the Prichep car passing him to his left; he fell in behind for the purpose of passing a car which was immediately in front of his taxicab in the center lane; then, when in the left lane, he trailed Prichep's car, as he said, for two or three minutes. The speed of the taxi according to Chametznik's testimony could not exceed 45 m. p. h. because of a governor which restricted him to that rate.

It is clear then that Chametznik knew that the Plymouth car was ahead and he followed it, as he says, at a distance of about 40 or 50 feet, at the speed above stated. His testimony is that when the Plymouth had proceeded about 150 to 200 feet beyond the turnoff at 87th Street, it came to a full stop without warning to him, that is, there was no hand signal made by Prichep nor was there a flash of stop lights on the rear of the Plymouth car; he says that the stop was so abrupt that he was unable to avoid crashing into the Prichep car.

It should be noted that the 87th Street turnoff is available to cars proceeding in the right-hand lane. Prichep was familiar with this turnoff and had used it on several prior occasions, and it is therefore reasonable to infer that if he had intended to then leave the Van Wyck Expressway, he would have been proceeding in the right-hand lane.

There is no testimony that the rear stop lights in the Plymouth car were out of order, which means that the failure of Chametznik to observe their red flash is consistent only with a continued forward movement of the Plymouth car at the moment of impact. This is another way of saying that in my opinion Prichep's

car had not come to a stop prior to the collision; if it had, Prichep would have had to apply his brake to accomplish the purpose, since he was driving at about 30 to 35 miles per hour. If the brake had been applied, the red stop light would have automatically flashed a warning to a following car, and as above stated, Chametznik said that none appeared.

It is argued for the plaintiffs that the court should ascribe to Prichep a preoccupation based upon his having inadvertently proceeded beyond the 87th Street turnoff, and in order to remedy his position when he realized this, he came to a stop. That does not make sense, as the evidence is presently understood. If it be true that he had unconsciously passed beyond the 87th Street turnoff, he could not hope to retrieve his error by stopping in the extreme left-hand lane; to meet this reasoning, it is further urged that according to his testimony, he was intending to leave the Van Wyck Expressway at a newly opened turnoff which was an undisclosed distance beyond 87th Street. That is purely argumentative, and has no support in the testimony; if it were deemed to be true, it would lead nowhere, and would not explain the complete stoppage which the plaintiffs' and Chametznik's attorneys assert.

Thus attention is drawn to the testimony of the witness Halpin, which has not been overlooked. He was proceeding on a motorcycle in a northerly direction, some 20 to 40 feet behind the taxi, but his position was to the right of the lane in which both the other cars were then proceeding. He said that he could see the Plymouth car from his own position, and that it did come to a stop before the taxi collided with it.

Halpin said that he promptly steered his own vehicle on to the mall, thus avoiding the taxi after it had struck the Plymouth car, and that he gave his name to the daughter of the plaintiffs, and stated his willingness to testify as a witness, if litigation should be the outcome of the episode.

The fact that Halpin's name was not disclosed to the attorney for Prichep at the time when the deposition of the daughter was taken, and thus Prichep's attorney had no notice prior to the trial that Halpin would be called as a witness, does not indicate that his testimony should not be given its due weight.

Halpin impressed the court as being an honest person and as one who believed in the truth of what he testified to; however, I find it difficult to visualize his having made an accurate observation concerning the Plymouth car, having in mind that his attention must have been largely centered on the operation of his own vehicle; nor is it easy to suppose that while proceeding as he said he was, he would have occasion to look beyond the taxi, and carefully and accurately note the handling of the Plymouth car.

It is for the foregoing reasons that the testimony of Mrs. Dark, called as a witness for Prichep, is thought to be more reliable—namely, that she observed the taxi as she said "zooming" along and that the Plymouth car was overtaken and struck by it, with the results heretofore stated; this means that the latter had not stopped just prior to the collision.

She was walking in a southerly direction near the service road which adjoins the southbound lanes of the Expressway; she was therefore perhaps a hundred to one hundred and fifty feet from the place where the collision occurred; she said she was observing the northbound traffic; since it does not appear that any cars were moving on the southbound lanes that would interfere with her line of vision, her testimony is deemed to be convincing and is accepted.

██ It is therefore found that the taxi struck the Plymouth car as has been stated, at a time when the Plymouth was in motion, and that the collision was due to the fact that the taxi was being driven at too great a rate of speed to enable it either to cut to the right of the Plymouth and pass it on that side, (which I think was attempted) or to remain in a safe position behind the Plymouth car.

It is further found that the collision was not caused by the negligent operation of the Plymouth car by the defendant Prichep.

The remaining matters to be decided have to do with the nature and extent of the injuries suffered by Mr. Dilg and his wife, and the consequent judgment to be entered in the plaintiffs' favor.

As to Mr. Dilg, he was 57 years of age at the time of the accident, and it is found that he suffered the following injuries:

Severe lacerations of the frontal scalp, which caused profuse bleeding, and a fracture of two fingers of the left hand; the scalp injury was an incident of a cerebral concussion. There was also some indication of a possible fracture in the cervical area of the spine, although that aspect of his injuries was not discovered in the second hospital to which he was taken. There was no permanent disability resulting therefrom, if indeed it did happen.

Necessary surgical procedures repaired the injuries to the scalp and to the fingers of his left hand.

The recovery of Mr. Dilg according to his own testimony, has not been complete because of continued headaches and such shock to his nervous system that his activities have been greatly restricted; and because he suffered recurring fits of depression with their attendant sequelae, as a result of the injuries above recited.

Doubtless the experience produced pain and therefore affected for the time being, Mr. Dilg's general outlook upon life, but the change in personality argument is less than persuasive, because to a very great extent that was under the control of the patient; he could adjust himself or not, to the very severe experience that he was called upon to undergo, but if he lacks the essential qualities to discipline himself, that is scarcely a basis upon which damages can be computed in such an action as this.

The special damages stipulated include medical treatment and hospital expenses in the sum of $1,807.79.

Mr. Dilg also asserts that by reason of the injuries suffered by his wife, he was required to employ household help which would otherwise not have been necessary.

As to this element of damage, a maid was employed at the rate of $35 a week following the return of the plaintiffs to their home in Florida in September of 1953. Mrs. Dilg explained that prior to the accident she preferred to do her own housework, although it would seem that for persons in their station in life, the contrary would have been the fact; however, the testimony is accepted as to the rate of compensation, and it is deemed that an allowance should be made at that figure for a period of one year, terminating in September, 1954; this on the theory that if the maid's services were continued thereafter, it was a matter of preference and not necessity. The sum so computed is $1,820.

The award therefore to Mr. Dilg is $12,627.79, of which $9,000 is to compensate him for pain and suffering, so far as money can accomplish the purpose, and other incidents of the damage so occasioned (it was stipulated that he suffered no loss of earnings as a bank president, or otherwise); $1,807.79 represents the agreed reasonable value of medical and hospital services; and $1,820 represents the services of a maid for one year.

Mrs. Dilg suffered a possible skull fracture, also a concussion; possible brain laceration, sprain of the right thumb and hand, a contusion in the left malar region, multiple abrasions, injury to the sternum, and ecchymosis of the left eyelid.

It appears that following hospitalization, and recuperation in the Adirondacks, Mrs. Dilg suffered from confusion, nightmares and pain, namely headaches that were very severe.

The plaintiffs returned to their home in September of 1953 and the testimony is that Mrs. Dilg was unable to resume her housekeeping duties, and therefore a maid had to be hired for that purpose, as heretofore stated.

The residual effects upon Mrs. Dilg are pretty well confined to severe and frequent headaches, but this condition has diminished. No sum of money could adequately compensate a person for recurring and severe headaches or for the deleterious effects thereof so far as social activities are concerned; but judging by the appearance of Mr. and Mrs. Dilg on the witness stand, and the demeanor of each, and all that was revealed in their testimony, it is the opinion of this court that a very substantial recovery in all departments has taken place with respect to both witnesses and that if they so desire they can resume their manner of living as it existed prior to this unfortunate accident.

The award to Mrs. Dilg which is believed to be fairly compensatory, is $6,500.

Therefore judgment is ordered in favor of the respective plaintiffs against the defendant Harry Chametznik, as above indicated, with costs.

The complaint is dismissed as against William Prichep and R. C. Williams & Co., Inc., with costs.